Good morning, Your Honors, and may it please the Court, Margaret Farren, I'm from the Federal Public Defender's Office, appearing today on behalf of the defendant and appellant Christopher Burnell. And I would like to reserve three minutes of my time for rebuttal, please. I'll be sure to watch my time. This Court should vacate Mr. Burnell's sentence and remand for further proceedings for two reasons. First, the District Court abused its discretion in appointing counsel in the place of his retained counsel. And second, the evidence at sentencing was insufficient to include the many alleged victims in relevant conduct, which dramatically affected Mr. Burnell's guideline calculation, or to prove the loss amount or the disputed enhancements. I'd like to start by discussing the District Court's denial of Mr. Burnell's request to substitute counsel. There are two legal standards that have been sort of brought to bear in the briefing of this case that are relevant to that inquiry. But the correct one is the Rivera-Corona standard. Rivera-Corona is the case in which this Court was very specific and intentional about saying, when a party has a retained counsel and seeks to discharge that counsel, we're going to clarify and announce the standard that applies in that situation. And because this situation implicates a choice of counsel, right, not just the right to adequate counsel, then that must be granted unless denial is not just, you know, found to be warranted, but compelled by the purposes inherent in. But, you know, Rivera-Corona also says, conflict between the defendant and his attorney enters the analysis only if the Court is required to balance the defendant's reason for requesting you know, done at the very last minute vis-à-vis the sentencing. Why isn't that factor now back in even under that standard? And so we really sort of end up in the same place, whether or not the last minute nature of this was justified. I understand, Your Honor. And I think that's kind of why I addressed all of these factors in the briefing. It does, I don't deny that it comes in because you're looking at what's fair and just and what's compelled. But I do think that the Rivera-Corona standard puts the onus on the government. I think it's more favorable to the defendant. I think it has to not just be appropriate, but compelled. Well, but I mean, the other question I have is, there's really two components of this because actually when defense counsels stood up, there were two requests. The first is to withdraw the plea. And actually, that's the first thing that he says. And then that he wants to get rid of me and have the public defender. And the judge addresses those separately and says, you know, we're not withdrawing the plea today. That's not happening. We went through the colloquy. That's not justified. And then he addresses with that off the table, there's not going to be a withdrawal of the plea. Then it's a sentencing. And then at that point, the interference with the court schedule is at its maximum because the only thing left is a sentencing. They're there for the sentencing. And so why isn't this just governed by the conflict language that I just read? And this is abuse of discretion. So I don't really see the compelled comes into this when you frame it that way. I'm sorry. To clarify Your Honor's question, is Your Honor asking whether it's an abuse of discretion standard that's being applied now? Correct. Okay. So I don't know that Brown or Rivera-Corona addresses whether the effect of this test is to bring abuse of discretion back into the inquiry at the end. But I do think that one thing that they, and I don't know that the case law addresses that specifically, but I do know that what they say is that under this test, because there is this right to discharge counsel for any reason, there needs to be at least a determination of why this request is made so late. There needs to be a fulsome inquiry, an informed basis for decision as to why this request was late and what the nature of the conflict was. That has to happen. And if Your Honors don't mind, I actually would like to kind of just go through this test. I think this gets to the heart of the inquiry. What happened? What does the record show us? There's a lot we don't know because the district court kind of initially said, I don't want to get into the nitty-gritty of this and cut off its inquiry, but this is what we do know. We know that Burnell's complaint was that he was forced and deceived into pleading guilty. That's what he said. Counsel said the word forced also. That's the essence of it. We also know that Burnell's, what he said his understanding was of his plea was that he was only pleading guilty to the $557,000 in the indictment, not a greater amount. I understand that the government is saying that the plea colloquy disproves that, but when you really look back at the plea colloquy, what it really shows is that actually counsel coming up to the eve of trial specifically negotiated with the prosecution for a much greater amount of money than he was told. But in the plea colloquy, Judge Fitzgerald specifically warned him that there might be other victims and that he could take that into account at sentencing. I don't read it that way, Your Honor. I don't think it was ever said there could be other victims. This is what was said at ER 116. It says, let's deal with the wire fraud charges first. Mr. Burnell, what we've just heard that the prosecutor had just read, in a sense, is part of what is in the indictment. By pleading guilty to the extent that there's allegations here of things that you did that were not included in that factual basis, then at sentencing, you could potentially, I don't know if you'll want to or not, you could dispute them. Now, if I were a criminal defendant hearing this It's the next paragraph. Okay, but let's look at that then. For instance, the counts deal with just one victim in particular, or perhaps as to other victims there might be, or I guess a couple of victims. There were, in fact, JT and the trust. There were JT and the trust in the counts he pleaded to. But in any event, the victims that were listed in these counts as opposed to others. But what does this, what does this, opposed to others who are not listed in the counts. But he doesn't say other victims who are not listed in the counts could come in at sentencing. I frankly, honestly, Your Honor, respectfully to the district court judge, I don't know what this means. If you just syntactically listen to what is said here, it's what the words that are spoken. For instance, the counts deal with just one victim in particular, or perhaps as to other victims there might be, or I guess a couple of victims. But in any event, the victims that were What does that mean? I sure don't know. If I were a criminal defendant sitting there, I think I can challenge it if they try to bring in victims as opposed to who I pled to. That's a very reasonable way to interpret that statement, which doesn't respectfully dramatically make sense. He also reduces the other victims thing a couple of pages later. And he said, when he gets into the amount of penalties, he said that would certainly be the victims who are  Okay, I'm sorry, Your Honor. Conceivably, I'm on page 28 of the plea transcript, ER 123. That would certainly be the victims who are mentioned in these 13 counts. It might conceivably be other victims. If I determine that they exist, and it could, it will be in whatever amount is determined. I mean, we just heard a list from the indictment, but whatever the amount is that is determined by the evidence, I will impose it at the sentencing. And even if you and your lawyer have guessed wrong, where the amount is greater than you think it is right now, that is going to be the amount of restitution. Do you understand that? Yes, Your Honor. Your Honor, this is restitution, not loss amount. This paragraph at ER 123, page 28, line 20. Mr. Burnell, in addition to the penalties here, a fine or prison time or supervised release or the payment of $100 per count, the law also imposes, and it's mandatory that you make restitution. So now we're in the realm of talking about restitution. We're not talking about offense level calculation of a custodial sentence. We're saying restitution. That would certainly be the victims who are mentioned in these 13 counts. Ms. Farron, what are? Oh, well, I guess I'm wondering how the fact that he has admitted the truth of the PSR factors into this. Your Honor, I'm sorry, where did he admit the truth of the PSR? The counsel conceded the guidelines calculation, I understand, and I believe, actually, that that resulted from a breakdown of representation. I think that was ineffective assistance of counsel for many different reasons, Your Honor. I didn't see where he admitted the truth of the PSR. In fact, quite to the contrary, in the plea colloquy, he said, where he is again being addressed by the court, the prosecutor reads a narrowed version of the factual basis relating only to investment. That is the only thing that's talked about in the factual basis there. So this is at ER 13? Yes, correct. Are there factual errors in the report? We'll get to the guidelines in a moment. Are there factual errors in the report? No factual errors, Your Honor. I'm sorry, can you please? To ER 13, it's line 21. ER 13? Yeah. Okay. All right. Are there any factual errors in the report that you want to bring to my attention? No factual errors, Your Honor. Is that where, is that what Your Honor is understanding to be an admission of the facts in the PSR? That's what it seems like, and the court is in this, it's not talking about a piece of the PSR. Did defense receive a copy of the pre-sentence report? That's what they're talking about. It actually doesn't say he received a copy. Just, I'd like to note, was a copy provided to Mr. Burnell? Counsel doesn't say it was, he says I discussed it with him. But in any event, factual errors. I think part of the problem here is, regardless of the facts, whether or not it was true that there were people to whom Mr. Burnell might have made other statements that weren't even fraudulent or had no relation to investment fraud, is a separate question from whether those things could be brought to bear on his custodial guidelines calculation. That is the thing that I think his contention was, was not never made clear to him, because he was told his lawyer negotiated with the prosecutor on the eve of trial for a narrowed factual basis. Judge Fitzgerald said, and I assume this was the product of negotiation with the government. He says, yes, it was. He says, I'm sorry, it was the product of negotiation with the government. His counsel, I can imagine a scenario, it wasn't developed because there wasn't an adequate inquiry, but where it's coming up to the eve of trial, counsel is nervous because he's not prepared for trial. He says, you need to plead guilty to this. I promise you, you're only pleading guilty to a narrowed factual basis. Only these two victims in the indictment don't work. And he never tells him, hey, all the other people in the indictment who I'm pleading out of this factual basis can just come right back in at sentencing and submit a claim for restitution, no matter how unrelated these, these statements were that you made to them, or whether it was even actually fraud. I don't think that was ever said to him. Were there other conflicts between Brunel and his counsel, aside from understanding the ramifications of the guilty plea? Your Honor, I actually think glad you brought that up, because I want to point out, this was not the first time that Mr. Brunel tried to discharge this counsel. He initially was indicted in December of 2017, and he had a lawyer that was brought on to represent him for a limited purpose, Jeffrey Danes. There's a declaration from that counsel at F.E.R. 8-90, says I was retained for a limited purpose just to assist him in trying to get released and to find really a permanent counsel. This new counsel substituted in in August 2019. That's S.E.R. 18. And then a couple months later, there was a pre-plea conference where Brunel said, I actually would like to substitute out this person. I'd like to, I'd like to find a new counsel. And at the end of that conference, he asks Judge Fitzgerald, can I talk to you privately? He wants to talk to him about that counsel, and Judge Fitzgerald says, no, you cannot. You have a lawyer. This is E.R. 217. I'm sorry, E.R. 217. The defendant, this is going back to the prior page, I guess. So another thing that occurs repeatedly in these pretrial conferences is that Judge Fitzgerald repeatedly says, you can switch your counsel anytime you like, you just can't get a continuance. So he says that to him again here at E.R. 216. You aren't going to get to continue to get delays of the trial. Pick a date in April, write it up, submit it as a stipulation for excludable time. I'll look at it. But when you're out looking for a lawyer, let him or her know that she's going to have to be ready to try this case on the date in April. Now, this is before the COVID pandemic came in. But then the defendant says, I understand, Your Honor. I was wondering if I could address the court privately. And the court says, no, you've got a lawyer, and I really don't see any need for that. Well, Ms. Farron, I think we've, we've got, um, there's, there's statements in the record about a conflict. Um, and this is back on the substitution piece. Uh, I guess to follow up on Judge Collins's question, um, here we've got a point under Rivera Corona where the fair administration of justice, um, is at its maximum in terms of just getting that sentencing done. It's at its highest. It's hard to imagine a higher point where a district court would have interest in wrapping things up and, and, and compared to a trial, Your Honor, though, I think that might actually be more because then you'd have witnesses, you'd have a whole, you'd have a whole trial. But we're, we're working with the claim that's before us here, which is about a request for substitution, not on the eve of sentencing, at sentencing. Um, so under Rivera Corona, um, which does not itself specify a separate three-step process of timeliness and inquiry and balancing, which that might be a good idea. And we've done that in some of our cases, but where there couldn't be any greater interest in the district courts moving through the process, how great a level of conflict would be necessary to countervail that under Rivera Corona? And where can we find that in the record? Well, I think certainly if there was a misrepresentation made to him about his plea and he wasn't aware of that, that would be a very at very minimum would need to be explored. I mean, it's never just, it's never, even under the regular three factor test, just delay. Um, Damore says even if it's on the day of trial, you can never just say delay, done. You don't get to substitute. You have to look at what the conflict was. And here, what was alleged was actually a very serious conflict of deceit and being forced into trial. Now, why did, and also, why did he wait till he... It's just a generic claim of forced. He, he had specific complaints, which is, I didn't think the amount could be 7.5 million. I just didn't think that that could come back. Um, that was, you know, his primary objection. But why didn't he think that, Your Honor? I mean, I think that what we, what we have here is a case where counsel worked out a deal to... Judge Fitzgerald knew that he had told him that the restitution could be higher, that other victims could be considered at sentencing. And he knew that he had been told the sentence could go up to 226 years and that he wasn't bound by anything, and there were no guarantees as to where in that range that it could be. Respectfully, Your Honor, he... That's standard stuff for a plea colloquy to prevent people from coming in at sentencing or coming in later and saying, well, I, I wasn't told that this could happen. Well, the court told you that that could happen. What the court said when he mentioned the I just have to tell you this. That was not really a real thing that was brought to bear at the change of plea hearing. And the other thing is, regardless of the stat max, which the judge told him he probably would never get, what about... He didn't say, he did not say he probably would never get. Well, let's look at what he said. He might not get that. Let's look at what he said here. ER 119. Mr. Bunnell, it's not to say that you would receive that, a sentence like that, or anything close to that. That's it. 21 to 24. Right, but that's not a statement of probability. It's just to say that it's a possibility that that won't be. But I think getting back to what the conflict was, if it's... Mr. Bunnell, first of all, we don't know what the full extent of the conflict was, because the court said, I'm not going to get into the nitty gritty of that. I'm just not going to ask about it. We don't know. Maybe there was an argument where there were maybe somebody felt physically threatened. Maybe there was a misrepresentation about how the guidelines were calculated. We just don't have that record. We don't have that information. But at most, these allegations leave room for a very serious scenario that the district court consciously and deliberately decided not to investigate and not to inform itself of. Does Rivera Corona require an inquiry? Yes, it does, Your Honor. Rivera Corona does require an inquiry. In fact, Brown, which is the case that applied the Rivera Corona standard, said in that case, the court actually cited delay and untimeliness as the reason for denying substitution. But Brown said, when the onus is sort of on the government and the court to really show that this is compelled, we need to actually look behind, is there really gonna be a delay? How much of a delay? The court has to at least consider how much and why, and why this request was made late. But that's the kind of... I guess an inquiry into the conflict, because the district court, I think, well knows the delay. I think that was at the front of the district court's mind in this. So if the only inquiry required by our cases under the Rivera Corona standard is about the likely delay, it's not clear why that requires a colloquy with the defendant. I think to the extent Your Honors are opening up the inquiry, because I think what Your Honors have said in this argument is that if there's delay, then there's gonna be a more fulsome look at the justness and if that delay is warranted. I think that then does require a look into how serious of a conflict this is, and at minimum, why was there a delay? I wanna just point out, we don't know why Mr. Bernal waited until the eve of sentencing or until the day of sentencing to raise this, but he said he had been trying to withdraw. He said he'd been trying to do... To bring this to the court's attention earlier. We don't know why, but he'd been told by the court back in 2019 that he can't address the court outside of counsel. He asked to talk to the lawyer. I think it's possible, had the district court inquired, we might know, but maybe he asked his lawyer, can you file this motion, please? Because I now see this PSR that's just been... It was disclosed on August 9th. On August 10th, the counsel moved to continue. For all we know, Bernal said, whoa, wait a second, I had no idea that all of these people could be brought in. You never told me this. You told me that I was only pleading guilty to this narrow set. Counsel files a motion to continue on August 10th, and maybe Bernal's saying, hey, please file a motion to withdraw in the court, and maybe counsel didn't do it. That's the problem. We just don't know that, because that inquiry was never undertaken. And yes, I think Revere and Corona and Brown are very clear that the court needs to apprise itself, inform itself of why there was this delay. It needs to learn about the conflict too, but at the absolute minimum, why was there a delay? Why did the person wait so long? We have Mr. Bernal saying he was trying. We have Mr. Bernal saying his counsel lied to him, and we have counsel himself saying he knew he needed to do certain things for sentencing that he just didn't do. Even in that continuance request, he says, there have been things brought up by the prosecution or in the PSR, the August 9th amended PSR, that I really need to address, and I need a continuance for that. Well, then he gets to the sentencing and said, I just didn't do it. What happened between August 9th and August 30th when he said, I just didn't do it? That's kind of a black hole. We don't know why, but something very serious happened in that time period that the district court made a decision not to inform itself of, and I think that's a big problem. And under Rivera, Corona, and Brown, that's something that at very minimum warrants a remand for a renewed hearing. Okay. Can I just... Before you sit down, I'm gonna give you the three minutes for your rebuttal, because we've asked you a lot of questions and taking over your time. I appreciate that. But I had one housekeeping question. Why are the briefs under seal in this case? Because it seems like the sealing was because of this colloquy at the time, and so should these briefs remain under seal? Your Honor, I think the unredacted briefs are under seal. There is a redacted version that's in the public record. But why is anything redacted from the public record? I think it's appropriate that Mr. Bunnell preserve, and he does preserve his attorney client privilege for purposes of any remand and further proceedings in district court. He only is waiving this privilege to the extent of... Does the government not know what is in the sealed excerpt? Your Honor, the purpose isn't to keep it from the government. The government obviously needs to know that to litigate this issue here. But I think that the purpose is to maintain the attorney client privilege so that upon any remand or subsequent proceedings, there couldn't be a claim made that there was just a waiver by Mr. Bunnell. But why would the public not get to know? I don't understand why that's being... I just... Well, Your Honor, I think this was actually addressed in a motion to the government opposed sealing. I filed an opposition and it was actually maintained under seal as it had been. And I think the reasons for that are explained more fully in my filing. But I apologize, I didn't prepare for that particular issue. I didn't give you any warning that I was gonna raise, but it just... It struck me as a curious fact, and so I just wanna ask. And you've pointed me in the direction I should look for that, so I appreciate that. Thank you, Your Honor. All right, thank you. All right, we'll hear now from Mr. Alden. Good morning, Your Honors. May it please the court. Bram Alden on behalf of the United States. To answer Judge Collins' housekeeping question before I begin, the government did indeed oppose the sealing of the briefs. The defendant moved forward on the basis of attorney client privilege. The government took the position that the attorney client privilege was waived by bringing that as an issue on appeal, and the government does believe the brief should be unsealed. I have seen the sealed portion of the excerpts of record which were provided to me by defense counsel. As to the substitution of counsel issue, whether this court resolves that under the Rivera Corona standard or the Ceja Gonzales standard that the defense briefed in the opening brief before the government pointed out the Rivera Corona standard, I agree with the court that really the inquiry in this case comes down to untimeliness and delay. Under the Rivera Corona standard, that is, of course, the primary consideration. That's only true if he correct... The district judge correctly took off the table the motion to withdraw. Because if the motion to withdraw was well taken or if it was not properly denied, then it's not just a delay case. Then it's a question of we've got a bigger problem here and maybe another counsel needed to be brought in to sort it out. So it seems of central importance the motion to withdraw. And of course, the defense hasn't even claimed on appeal that the motion to withdraw was improperly denied. It seems embedded in the overall arguments that the colloquy that was made into the conflict, which was the basis of the motion to withdraw, was inadequate. So it's a little bit of... Simon says to say that attacking that issue doesn't attack both things that stand on that issue. It's a fair point. I think the defense hasn't even asked to withdraw the plea at this point in time. They've asked for a remand, I believe, for resentencing. But why was this an adequate colloquy into a serious matter like a motion to withdraw the plea? We went through, at some length, the transcript. And I think counsel has a point that some of the pieces of this transcript are not a model of clarity in terms of the reference to other victims. And so why was there a sufficient basis for him to just basically give the back of the hand to the motion to withdraw? So the motion to withdraw was obviously itself quite untimely given that the plea had been entered in May of 2022 and this is now August of 2022. Setting that aside... But the basis of it is that he did not properly understand what the significance was of uncharged victims. That was the core of it. I did not and would never apprise... My counsel did not tell me that other victims were gonna come back in at sentencing. And so then, in terms of looking at the motion to withdraw, you would say, what did the court say about that at the plea hearing? Which, of course, he would recall. And some of the comments that are in this plea transcript about other victims are a little confusing. This is literally verbatim, the paragraph. And for instance, the counts deal with just one victim in particular. And perhaps as to other victims, there might be, or I guess a couple of victims. But in any event, the victims that were listed in these counts, as opposed to others, what does that even mean? So I have a couple of responses to that, Your Honor. First of all, I do think that there is a level of clarity in there that there are other victims, but I think that's also supported by what the defendant already knew at this stage of the proceeding. The indictment, which is, of course, filed in 2017, lists nine victims and a total loss amount of over $5.6 million. So the defendant has long been on notice by the time of the change of plea colloquy that this is a case about more than just JT and the trusts. Thereafter, the defendant gets a PSR, the first PSR, in July of 2022. I believe it's July 11, 2022. That PSR lists nearly all of the victims, I believe 15 out of the final 18 for which restitution was ordered. And at that point, the defendant is again put on notice that this is a much bigger case than just JT and the trusts. Accordingly, it behooved the defendant to move to withdraw his plea far earlier than August 30th at the continued portion of a bifurcated sentencing proceeding. Another point of data that the defendant had by the time of the change of plea colloquy was that in 2020, there had been some discussion of whether he could substitute a surety in for one of his other sureties, at which point the government actually asked that he be remanded into custody because he was continuing to defraud one of the victims, BR, which was an elderly man who he was continuing to defraud while on pretrial release. That too put him on notice that this was a much bigger case than just JT and the two trusts. So I think by the time this change of plea colloquy comes along, and obviously your Honor pointed out as well that there are comments about restitution and other victims there too, this defendant knew this was much bigger. This was a much bigger case. Why isn't it a problem that it seems like we don't necessarily even get a full statement from Bernal about why he wants to withdraw? I'm just looking at ER 251 through 253. It seems like at some point the court kind of cuts him off and says, well, you know, like the court says that the rest, I understand that. And that's that. It's unclear that Bernal's even done sort of describing what the conflict is. Granted, the court could have allowed him to describe the conflict in more detail, but I think the court realized what was going on here, which was that this was a defendant who at every turn had attempted to avoid prosecution and avoid being held accountable. But I guess, you know, this complex sentencing and his understanding of it is kind of at the core of the rest of the issues in this case. And here we are where he hasn't said he's read the PSR, but it's been discussed. And he's saying that he has a conflict. There's no inquiry. I can't find another one of our cases where there's just no open-ended questions. And his lawyer is saying, for the first time in my career, I have been unable to prepare a sentencing position on this incredibly complicated sentence. Did the court have any obligation to perform an inquiry? Can you point us to any of these substitution cases where there was no inquiry? And in fact, the court affirmatively said, I don't want to get into it. I would say that the best case for the government is Reyes-Basque, which is a case in which this court observed that the district court had conducted a brief ex parte inquiry, just as here. I do not know or don't have in my notes all of the questions that were asked in that case, but I do believe that what happened there is very similar to what happened here, which is that the district court realized quite quickly into the colloquy what was going on and what was going on was that this defendant wanted to withdraw his plea rather than actually expressing some serious disagreement or inability to work together with his counsel. The reason why there was any conflict between this defendant and his counsel was because he wanted to withdraw his plea and avoid sentencing entirely. It was not any sort of serious breakdown in communication that this court has recognized. What are we to make then of the lawyer's statements that neither of them were really prepared to face sentencing? I mean, that's what I take to be the fact that he wasn't able to prepare a sentencing position. So to the extent that that, I think, actually goes towards ineffective assistance of counsel and whether there needed to be some sort of position filed or there was a reason for the defense counsel had not filed the sentencing position? Well, I think the reason is the conflict and the court doesn't ask anything about it to let us know whether he's properly, whether the court's properly exercising its discretion in this. From the court standpoint, it was clear that what the defendant wanted to do and what the defendant himself said and what his counsel said was withdraw his plea. And why the defense counsel didn't actually file a sentencing position isn't established by this record except insofar as there was a colloquy about how the defendant wasn't providing information to his lawyer. That needs to be litigated via 2255 to determine both what was the defendant doing and why was he doing it and what was the lawyer doing and why was he doing it? Well, I mean, I suppose it could, but under our cases, why should we all not be entitled to a little more inquiry in terms of the nature of the conflict given that all we have on the record is that the conflict is related to his inability to develop a position on sentencing? My read of the record is that the conflict is related also or primarily to the fact that the defendant wanted to withdraw his plea. And that is, I think, what the district court quickly came to determine when it said, and I am not withdrawing, I am not allowing withdrawal of the plea, which is why we're going to go forward with sentencing today. What was Burnell allowed to say about the conflict issue? What's, where would you point to on the record where we have the minimal inquiry that may be required? So at 3 ER 251, that is where the defendant is speaking to the court about telling me to do the open plea. And I was trying to shield his ex-wife and his daughter. I never once knew at the time that I was pleading to 7.5 million and I was looking to 15 to 20 years. That's about the plea. I think the concern is, is that when the substitution request comes in, um, he cuts them off. Does he not? My understanding is that was about the substitution request because that was the point of the sidebar in the first place. And the reason why it immediately shifted to a discussion of withdrawing the plea was because the substitution request was premised on his desire not to go forward with sentencing because he wanted to withdraw. He continued on ER 252, I've been trying to withdraw. I didn't want to wait until the last minute. And that is consistent with what his counsel then said that how this works. And then the defendant chimed in again immediately after his counsel without the court interceding and said, and I have been trying to do the withdrawal of the plea again. Given that record, Reyes-Foskay pointed out that the inquiry needs to determine what is going on. And the district court quickly could here, which was that this defendant simply did not want to be sentenced. And going back to some of the comments that both Judge Collins and Judge Johnstone, you made earlier, this is at the maximum. I think you both used that word in terms of when the delay and untimeliness is really problematic. And I would say that even beyond just being during the sentencing, this is at a bifurcated sentencing proceeding, which at the defendant's request, his portion of the sentencing has already been continued by 15 days. The victims are actually seriously prejudiced by the way this proceeding has gone down because they had to there is going to be further delay. But once he denied the motion to withdraw and then once he denied the motion to substitute counsel with the public defender, he knew at that point what had happened and that the lawyer had essentially gotten jammed by this process and had not been able to do even the kind of minimum level of preparation. Wasn't it incumbent on the court to at least put it over for a couple of weeks so that he could file something now that he knew that the reason why he didn't get a sentencing position, which the lawyer said he had never done before in his career, not file one, was because of this mess that had just developed? I mean, it seems highly prejudiced to just plow through with kind of winging it. Well, that really requires development on a 2255 because we don't know what the defendant was telling his lawyer about why he didn't file a sentencing position. He very well could have said, please do not file anything because I do not want to be sentenced. We don't know. And my opposing counsel offers a lot of speculation too about conversations that could have happened. Was there a request at that point in any portion of the sentencing hearing to put it over for a further period of time? I don't believe so because what had happened at the colloquy between the district court and the defense counsel and the defendant outside the government's presence was that the court had said multiple times, we are going to clear that there could not be further delay. The government had already opposed this bifurcated model where part would be continued because the defendant had filed an ex parte application five days before the August 15th sentencing, an application on August 10th asking for a two-week continuance, which the district court had already granted by bifurcating the sentencing proceedings so that the victim spoke on August 15th and the defendant was then sentenced on August 30th. The other thing that I would point out though in respect to what the defense counsel might have filed, and may I finish that in so I see him? And then I have one further question. Okay. Is that we don't know the potential prejudice from any further analysis or inquiry. In fact, I would admit that the more that was talked about and discovered about these victims, the greater the loss amount seemed to get. And the defense in their opening brief pointed out three instances where there was a discrepancy between what a victim claimed they had suffered and what the PSR actually awarded them. In all three of those instances, the victims claimed higher loss amounts and I had found multiple other victims. I don't want to go through them given the time now, but the victims who claimed more loss than they were awarded. You're kind of heading towards the question that I had, which is the victims for whom restitution is ordered, were there any people on that restitution list who were not included in the PSR's description of the victims for purposes of calculating the guidelines? No. In the initial PSR, I believe there were 15 victims and the government then identified it three more. All 18 of those victims were included both in the restitution calculation and the loss amount calculation. Okay, so all the victims who were included in calculating amount of loss for purposes of the guidelines. No, my question is actually the opposite. I just want to make sure that I understand that everyone who was ordered to get restitution had already been included in calculating the loss under the guidelines. Is that correct? That is correct. The loss amount and restitution amounts, I believe, were actually the same in terms of seven and a half million or so dollars. And the persons match, so everyone on the restitution list was on the earlier list. The only other thing I would point out about that though is that JT, the victim of nine of the 11 wire fraud counts, was, according to the indictment, a loss or a restitution amount of $557,000 whereas his actual restitution award was only $62,500. And the actual amount of loss for which he was included in the loss calculation was only $62,500. So again, that's another piece of data indicating that the more anything was explored in this respect, the more the loss amount was going to go up. There is therefore no plain error and no basis for this court to reverse. Okay. Thank you, Your Honors. Thank you, counsel. All right, we'll hear Rebuttal now from Ms. Barrett. I appreciate Your Honors giving me additional time. I wanted to start out by addressing the loss amount here. PSR 273 is where the victims are listed who are included for restitution and loss. If you look at what substantiation was provided for any of these numbers, which add up to $7.5 million, the only amount that has any amount of substantiation in the form of a victim statement is $2.8 million. That's from the victims who actually submitted statements that provided some amount. Those were S, B, M, E, D, S, G, T, K, S, H, F, M, R, L, S, and K, L. If you add those up, just the ones that had actual statements with numbers, you only get to $2.8 million. The government says that the more you look into their statements, the greater the loss grows, but that's not correct. The probation department looked into, I suppose, presumably looked into these victims' claims about how much they lost and found out that they lost less. Even the ones who actually gave numbers lost less than they claim. But then the remainder of it, to get from $2.8 million up to $7.5 million, there's no substantiation at all. We don't have any victim statements from many of these victims. There were seven who provided no victim impact statement at all. There were two who provided a victim impact statement that just had no amount. We don't know how the probation office calculated this amount, which is profoundly large and way beyond what Mr. Burnell was told about it. What is the court to do, given, at least through counsel, Mr. Burnell's concession that the facts were accurate, that there were no errors? I don't know that we can take it in that way, because the PSR contained no facts about this. There were no facts. This is just a conclusion as to loss. There were no facts at all to talk about as to who is even, for example, EB. I don't know who that person is. That person didn't submit any statement, and there was no description in the PSR or by probation of how that person sustained a loss. And then the idea of relevant conduct. It's real offense sentencing. That's the idea of relevant conduct. What was the real offense? Well, as Mr. Burnell pled to in the narrowed version of his factual basis, it was investment fraud. But now, suddenly, we have all comers at sentencing. Anyone who feels that Mr. Burnell owes them any amount of money because he asked them for too much money for his household expenses, or he said he had a child custody battle over a period of eight years, can suddenly just come in and, I guess, apparently submit a paper to the probation department saying he owes me this much, and they get into the PSR. I cannot imagine that this is okay. I know that in Lucas, this court recently held that clear and convincing evidence is not a standard that applies. But as a trade-off for that, there's a real standard that needs to be met. It's actually a preponderance of the $5.5,000, $557,000, up to $7 million, which is really what happened here, against the backdrop of a plea colloquy that was profoundly confusing, and where Mr. Burnell specifically bargained for not pleading to the whole indictment. The other thing, I'm sorry I'm going on, I apologize to your honors, but the court says he had notice, but he didn't. He didn't have notice from the indictment because he specifically bargained at his change of plea hearing for a lesser amount of conduct, and we don't know when he received the PSR. That's never shown in the record. It was, the admitted PSR was provided on August 9th, which was six days before the initial sentencing where the victim spoke. We don't know when his counsel showed that to him, or if he'd even received it, because the counsel said, I discussed it with him, but didn't say when. We really have no idea when Mr. Burnell learned suddenly that it's not just $557,000, but millions of dollars. We had no idea when that was learned about because that was never inquired into by the court. Finally, your honors, Reyes-Bosquet, the government's best case, said that the reason that it was okay to not allow substitution was specifically because the court asked follow-up questions. It said there was follow-up questions asked by the court. That's at Reyes-Bosquet. I'm sorry, Page, well, in any event, I don't know. When Reyes-Bosquet gave additional reasons for substitution, the counsel prevented him from testifying and did not call certain witnesses. The court asked specific follow-up questions. It did that in Reyes-Bosquet to determine the extent of the conflict. That's the thing the court here explicitly refused to do. And then in the next paragraph, it also says there was no evidence that the conflict was so extensive that it prevented Reyes-Bosquet from communicating with his attorney. Well, here we have the opposite. We do have, they weren't communicating, that's clear. And in DeMora and Gonzalez, that's just a hallmark of a debilitating breakdown in the relationship that required, had the very minimums for the inquiry. Why didn't he move to withdraw earlier? Was it connected to the conflict? None of these questions were explored. And your honors, this added six to eight years to his guidelines calculation. It really skyrocketed his offense level. And it's profoundly important to the sentencing. I ask your honors to vacate the sentence and send it back, please. Okay. All right. Thank you, counsel. And I thank counsel for both sides for very helpful arguments in this matter. And this case is submitted and that concludes our calendar for this week. And we are adjourned. All rise. Hear ye, hear ye. All persons having had business with the Honorable United States Court of Appeals for the Ninth Circuit will now depart for this court for this session. Session stands adjourned.
judges: COLLINS, THOMAS, JOHNSTONE